C. Taylor Ashworth, AZ Bar No. 10143
Christopher Graver, AZ Bar No. 013235
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
cgraver@stinson.com

Proposed Attorneys for Arizona Heart Institute, Ltd.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ARIZONA HEART INSTITUTE, LTD. | Case No. 2:10-bk-24062-GBN |
| Debtor. | **DEBTOR'S MOTION FOR AN ORDER APPROVING SALE OF DEBTOR'S ASSETS UNDER ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; APPROVING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS;**<br><br>**AND**<br><br>**FOR AN EMERGENCY HEARING ON APPROVAL OF CERTAIN AUCTION AND BID PROCEDURES, INCLUDING A BREAK-UP FEE; SETTING DATE AND TIME FOR HEARING ON PROPOSED SALE; AND APPROVING FORM OF NOTICE OF AUCTION AND SALE HEARING** |
| | **Hearing Date:** None Set<br>**Hearing Time:**<br>**Location:** **Courtroom #702**<br>**230 N First Ave**<br>**Phoenix AZ 85003** |

Arizona Heart Institute, Ltd. ("AHI" or "Debtor"), Debtor and Debtor-in-Possession in the above-captioned Chapter 11 reorganization case, hereby moves the Court for an Order approving the sale of substantially all of Debtor's assets free and clear of all liens, claims and encumbrances under an

Asset Purchase Agreement with Hospital Development Company Number I, Inc. (the "APA"); approving Debtor's assumption and assignment of certain unexpired leases and executory contracts; and approving notice, bidding and sales procedures, including a break-up fee (the "Motion").[1]

To minimize potentially prejudicial delay to Debtor, Debtor requests that the Court set an emergency hearing within fifteen (15) days on that portion of the Motion requesting that the Court approve certain bidding and sales procedures described in paragraph 19 below, including a break-up fee (the "Bid Procedures"); set a date and time for a hearing on the proposed sale; and approve a form of notice of the Bidding Procedures and sale hearing.

## JURISDICTION

1.      On July 30, 2010, AHI filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Petition Date") in the United States Bankruptcy Court for the District of Arizona. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business as debtor-in-possession.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

4.      The statutory bases for the relief requested herein are §§ 105(a), 363 (including 363 (f) and (m) and 365 of the Bankruptcy Code.

## BACKGROUND

**General Background**

5.      In support of this Motion, Debtor incorporates by reference the statements set forth in the "Declaration of Ronald L. Rosenberger in Support of Chapter 11 Petition and First Day Motions" (the "Rosenberger Declaration") filed contemporaneously herewith.

6.      Debtor is a specialty outpatient clinic dedicated to the prevention, detection and treatment of cardiovascular diseases. It was founded by Edward B. Diethrich, M.D., in 1971, and at its height operated numerous offices across the Phoenix metropolitan area. AHI is distinct for being the

---

[1] Unless the context otherwise requires, capitalized terms not defined in this Motion have the meaning ascribed to them in the APA.

2

DB04/839144.0002/3018472.9 DD02

nation's first freestanding outpatient clinic built solely to combat heart, blood vessel and other cardiac-related diseases. AHI further specializes in developing and implementing advanced non-surgical, interventional therapies intended to replace scalpel and suture treatments. AHI currently operates in two leased locations, and it employs 15 physicians and approximately 134 other employees.

7.    AHI generates the bulk of its revenue from fees charged for services provided. Roughly 52.5% of AHI's revenue is derived from Medicare and Medicaid, 44.5% comes from private insurance, and 3% is paid independently by patients receiving services.

8.    Turbulent financial conditions over the last several years,  and a general decline in medical reimbursement from Medicare and insurers, have caused AHI's revenues to decline significantly.  The significant revenue declines have caused AHI to fall behind on payments to a number of creditors, and have made it very difficult to maintain normal business operations.

9.    Debtor has been contemplating a sale of its assets for some time, and has been actively seeking out potential purchasers of its assets.

10.    Prior to the Petition Date, Debtor determined that the most efficient and comprehensive resolution to its financial difficulties, and the most effective way to maximize the value of its assets for the benefits of its creditors, would be through the sale (the "Proposed Sale") of substantially all of its assets (the "Assets").

11.    Toward that end, many months prior to the Petition Date, Debtor began marketing the Assets. In March, 2009, AHI, with the assistance of a local investment banking firm, began investigating the possibility of raising additional capital and a possible restructure of AHI through a merger with a nonprofit entity, the Arizona Heart Foundation, and an eventual purchase of Arizona Heart Hospital (at which AHI's physicians practice) using tax exempt financing. The results of the investigation indicated that this pursuit would take months to achieve given the hurdles in place relative to such a restructuring and offering.

12.    Between the end of March, 2009, and the end of October, 2009, the investment banking firm marketed AHI and sought to obtain new capital investors for AHI, both as an independent entity and in a combined transaction with Arizona Heart Hospital, with at least the following entities:

- AIC (a sale/leaseback firm) – March, 2009
- Capital Source – March, 2009
- Capital Funding Group – April, 2009
- Greyhawk – June – July, 2009
- Imperial Capital – August, 2009
- Endeavor Capital – August, 2009
- Mid Cap Turnaround – August, 2009
- Bertram Capital – August, 2009
- Crescendo Capital – August, 2009
- GI Partners – September, 2009
- Medical Facilities Corp – September, 2009

13.     During and subsequent to these efforts, AHI also had discussions about a possible acquisition with Banner Health and Catholic Health West, but these talks did not result in an offer to purchase AHI.   AHI also individually contacted several entrepreneurs, but again it did not generate an offer to purchase AHI.

14.     Upon exhausting what it considered to be all opportunities at the end of October, 2009, THE INVESTMENT BANKING FIRM communicated to AHI that it would not extend further marketing efforts on its behalf.

15.     AHI then contacted Vanguard Health Systems, Inc., a national hospital and health care organization, which indicated it had the resources and willingness to acquire the existing AHI operations at a reasonable sales price.   After some preliminary discussions and exchanges of information, earnest negotiations began in approximately December, 2009.  A Letter of Intent was signed in March, 2010,[2] and the parties engaged in months of protracted negotiations.

16.     As a result of these efforts, the Debtor was able to negotiate an agreement for the sale of its Assets to Hospital Development Company Number 1, Inc., a subsidiary of Vanguard Health Systems, Inc. (the "Proposed Buyer").

**Liens Claimed Against Debtor's Assets**

17.     Three creditors assert liens on some or all of Debtor's assets.

---

[2] After the Letter of Intent was signed, another health care organization, MedCath, expressed some interest in acquiring AHI and the Arizona Heart Hospital.  Because the Letter of Intent had been signed and negotiations with Vanguard were ongoing, AHI did not pursue Medcath's expression of interest.

Case 2:10-bk-24062-GBN    Doc 4    Filed 07/30/10    Entered 07/30/10 17:25:42    Desc
DB04/839144.0002/3018472.9 DD02      Main Document      Page 4 of 22

a.      GE Healthcare Financial Services asserts first liens on medical diagnostic and treatment equipment purchased by AHI. AHI estimates that GE's secured claim is approximately $1,334,384.46.

b.      NextGen HealthCare Information asserts a lien on Electronic Medical Records software. AHI has scheduled NextGen's total claim at $96,168.08 but is not able to estimate the portion of that claim that is secured.

c.      Northern Trust asserts certain equipment liens and a blanket lien on all of AHI's assets. As of July 21, 2010, Northern Trust's claims aggregated $6,670,361.69.

**The Asset Purchase Agreement**

18.      On or about July 30, 2010, Debtor entered into an Asset Purchase Agreement ("the "APA") with the Proposed Buyer. A true and correct copy of the APA is attached hereto as **Exhibit A.** The terms of the APA are summarized as follows:

a.      **Asset to be Purchased**. Debtor shall sell the Assets to the Proposed Buyer or such other party that submits a higher or otherwise better offer in accordance with the Bidding Procedures (an "Alternate Buyer"). As set forth in section 1.1 of the APA, the Assets include, among other things, all of Debtor's tangible property, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property (including the name "*Arizona Heart Institute*" and all other trade names and acronyms under which Debtor conducts the Practice or by which it is commonly known), prepaid expenses (other than prepaid insurance or prepaid other assets) and certain deposits, books and records (including all patient charts and records since January 1, 2007, patient lists and appointment books relating to patients treated by the Practice), and other assets owned by Debtor as set forth in the APA, including the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases designated by the Proposed Buyer or Alternate Buyer (the "Executory Agreements") (collectively, the "Acquired Assets"). Pursuant to the Bidding Procedures, Debtor will provide notice of the Proposed Sale, including the proposed assumption and assignment of the Executory Agreements (including such Executory Agreements set forth on Schedule 4.8 and 4.19 of the APA), to counterparties of the Executory

5

DB04/839144.0002/3018472.9 DD02

Agreements (the "Counterparties"), and the Counterparties will have an opportunity to object to the Proposed Sale and the assumption and assignment of the Executory Agreements (and cure amounts, if any, related to same) and be heard at the hearing on the Proposed Sale. Proposed Buyer may (i) remove any Assigned Contract or any Assigned Personal Property Lease set forth on Schedule 4.8 and Schedule 4.19 to the APA at any time up to, and including, the Closing Date, and (ii) add any Assigned Contract or any Assigned Personal Property Lease to Schedule 4.8 and Schedule 4.19 up to and until two days prior to the Sale Hearing.

b. **Excluded Assets.** As set forth in Section 1.2 of the APA, the Acquired Assets do not include, among other things, certain "Excluded Assets" which includes cash, cash equivalents, accounts receivable, income tax receivables, deferred tax assets, employee advances, amounts due from Affiliates, prepaid professional liability insurance, investments (including Debtor's interest in the Arizona Heart Hospital), and certain other assets described in Section 1.2 of the APA.

c. **Liabilities Assumed.** Pursuant to Section 1.3 of the APA, the liabilities to be assumed include post-closing obligations under the Executory Agreements (subject to the qualifications set forth in Section 1.3 of the APA) and certain accrued wages, salaries and employee benefits related to employees retained by the Proposed Buyer post-closing as set forth in Section 1.5 of the APA.

d. **Purchase Price.** The purchase price is Six Million Fifty Thousand Dollars ($6,050,000) (which includes the "**Good Faith Deposit**" (as defined in Section 2.5 of the APA) in the amount of $500,000) plus (i) Debtor's net cost of certain unopened, unexpired, undamaged and non-sample medical supplies and inventory; less, (i) the net book value as of the Closing Date of the Debtor's debtor-in-possession, bridge loan or similar financing or indebtedness related to the Bankruptcy Case, and any long-term indebtedness or capital leases assumed by Proposed Buyer at Closing; (ii) accrued vacation and other payable time off ("PTO") assumed by the Proposed Buyer, together with estimated taxes thereon; and (iii) the agreed upon value of any other liabilities that Proposed Buyer agrees to assume.

6

Case 2:10-bk-24062-GBN    Doc 4    Filed 07/30/10    Entered 07/30/10 17:25:42    Desc
DB04/839144.0002/3018472.9 DD02    Main Document    Page 6 of 22

e.     **Closing Date.**  Pursuant to Section 3.1 of the APA, the Closing is anticipated to occur on September 15, 2010, so long as all of the conditions to Closing set forth in Article VIII of the APA are fully satisfied, or on such date as the parties may otherwise mutually agree. The parties have agreed to use their respective good faith efforts to close the transaction contemplated by the APA as promptly as possible. However, the APA may be terminated by either Buyer or Seller if Closing has not occurred on or before September 30, 2010, as long as the terminating party is not at fault for the delay in closing.

f.     **Conditions to Closing.**  As set forth in Sections 8.1 and 8.2 of the APA, the closing conditions of the APA include, without limitation: accuracy of Debtor's representations and warranties as of the Closing Date; Debtor's performance of all obligations and covenants under the APA, including delivery and execution of all necessary documents; consent of the necessary state and federal government agencies in the assignment of certain licenses and other necessary consents and approvals; at least 14 of Debtor's physicians will have accepted employment with the Proposed Buyer or an affiliate thereof; and the Court's entry of a final and non-appealable order approving the sale.

g.     **Termination Rights**.  As set forth in Section 10.1 of the APA, the parties have certain rights to terminate the APA, including, without limitation,

  i.   By Proposed Buyer at any time after 15-business days following the date of the APA, if Seller has not filed the Sale Motion with the Bankruptcy Court on or before such date;

  ii.  By Proposed Buyer or Seller at any time after 30-days following the date of the APA, if the Bidding Procedures Order is not entered on or before such date;

  iii. By Proposed Buyer or Seller at any time after 30-days following the entry of the Bidding Procedures Order, if the Sale Order has not been entered on or before such date; and

  iv.  By either Proposed Buyer or Seller, if Closing has not occurred on or before September 30, 2010, provided that the right to terminate the APA under Section 10.1(e) will not be available to the party whose failure to fulfill any obligation

7

under the APA has been the cause of, or resulted in, the failure of Closing to occur on or before such date;

h. **Manner of Sale.** Except as otherwise agreed by the Proposed Buyer, or an Alternate Buyer, the sale of the Acquired Assets will be free and clear of liens, encumbrances, charges, claims and interests of every kind and description, with any and all such liens, encumbrances, charges, claims and interests to attach to the proceeds of the sale in accordance with the Bankruptcy Code and applicable law. Pursuant to the Bidding Procedures, the Debtor will provide notice of the Proposed Sale to, in part, all parties asserting a security interest in some or all of the Debtor's assets (the "Secured Claimants"), and the Secured Claimants will have an opportunity to object to the Proposed Sale and be heard at the Sale Hearing.

i. **Break-Up Fee.** In order to induce the Proposed Buyer to expend the time, energy and resources necessary to submit a "stalking horse" bid, Debtor agreed to provide, and to seek this Court's approval of, a Break-Up Fee. As set forth in Section 11.2(g) of the APA, in the event that the Proposed Buyers is not the Winning Bidder (as defined herein) of the Assets at the Auction, the Proposed Buyer shall be entitled to a Break-up Fee equal to 4% of the eventual sale price approved by the Court plus the Proposed Buyer's reasonable out-of-pocket legal and other fees and expenses not to exceed $250,000 (collectively, the "Break-Up Fee"), as well as the return of the Good Faith Deposit.

19. Section 11.2 of the APA also contemplates certain bid procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Acquired Assets, which are proposed to govern the Auction and the Sale, including approval of the Break-up Fee (the "Bid Procedures"). The Bid Procedures are an integral part of the APA, and were negotiated between Debtor and the Proposed Buyer to ensure that there was a fair and expeditious process under which Debtor could solicit bids for the sale of its Assets and hold an Auction there on in a manner that would ensure it receives maximum value for its Assets. Pursuant to the APA, Debtor is seeking approval of the following Bid Procedures:

a. **Auction.** The APA contemplates that the Court will schedule an auction at the offices of AHI's bankruptcy counsel two business days prior to the dale of the Sale Hearing.

8

The APA also contemplates that, if the Court so orders, the Auction may be conducted by the Court at the Sale Hearing

b. **Entry of Bid Procedures Order**. The APA contemplates entry of an order scheduling the Sale Hearing and the Auction, and approving the Bid Procedures, including the Break-Up Fee (the "**Bidding Procedures Order**"), which Bidding Procedures Order shall be in form and substance reasonably satisfactory to Seller and Buyer. A proposed form of Bidding Procedures Order is attached as **Exhibit B**.

c. **Good Faith Deposit**. Section 2.5 of the APA provides that the Proposed Buyer will deliver to Debtor a Good Faith Deposit in the amount of $500,000 within one day after the entry of the Bidding Procedures Order. The Good Faith Deposit will be non-refundable, except that the Proposed Buyer will be entitled to the return of the Good Faith Deposit (i) on October 15, 2010, in the event that the Bankruptcy Court does not approve the "**Sale Order**" (as defined in Schedule 1.0-F to the APA) (a proposed form of Sale Order is attached as **Exhibit C**) consistent with Section 11 of the APA by October 15, 2010, so long as such failure to approve the Sale Order is not attributable to the actions of the Proposed Buyer inconsistent with the APA, or (ii) within one business day of the close of sale of all, or any, of the Acquired Assets to any party other than the Proposed Buyer. The Proposed Buyer is entitled to credit bid the Good Faith Deposit toward its bid at the Auction.

d. **Consideration of Bids**. Any party wishing to bid for the Assets at the Auction (a "Competing Bidder") must have first submitted an initial, qualified bid (a "**Qualified Bid**"). A Competing Bidder who submits a Competing Bid in accordance with the procedures provided herein is a "**Qualified Bidder**." Debtor (after consultation with the Proposed Bidder) may impose any and all limitations, restrictions or conditions upon a Competing Bidder's ability to conduct due diligence that Debtor deems reasonably necessary to (i) avoid disruption of Debtor's operation; (ii) preserve the value of the Assets; (iii) protect confidential, proprietary or otherwise sensitive information; or (iv) address any other concerns Debtor has with respect to any particular factual circumstances surrounding or unique to any particular Competing Bidder (such as if a Competing Bidder is a competitor of Debtor).

9

e.  **Submission of a Qualified Bid**.  To become a Qualified Bidder, a Competing Bidder must submit a Qualified Bid in writing to Debtor and the Proposed Buyer on or before 5:00 pm (MST) seven (7) days before the Sale Hearing.  Debtor will notify each potential bidder (and the Proposed Buyer) whether each such bidder is a Qualified Bidder.  The Proposed Buyer is deemed to have submitted a Qualified Bid.

f.  **Requirements for a Qualified Bid**.  Each Qualified Bidder, by submitting a bid, shall be deemed to acknowledge that it understands and is bound by the terms of the Bidding Procedures and the Bidding Procedures Order.  A Qualified Bid must satisfy the following requirements:

    i.  The Qualified Bid must be in writing, fully executed, and accompanied by a form of APA substantially in the form of the Proposed Buyer's APA (**Exhibit A**, hereto), and must be black-lined off the Proposed Buyer's APA to show changes thereto;

    ii.  The Qualified Bid must provide all-cash consideration in an amount of at least $6,550,000 (the Proposed Buyer's purchase price plus $500,000) (the "**Minimum Overbid**");

    iii.  The Qualified Bid must be accompanied by a good faith deposit by wire transfer, certified or cashier's check, in the amount of ten percent of the Competing Bidder's Qualified Bid;

    iv.  The Qualified Bid must be accompanied by an executed confidentiality agreement and such an executed confidentiality agreement must be received before any Competing Bidder may conduct due diligence;

    v.  The Qualified Bid must be accompanied by written evidence of a commitment for financing or other satisfactory written evidence that the Competing Bidder has the financial ability to close the transaction contemplated in the Qualified Bid and to pay the purchase price in cash at the Closing, including, without limitation, providing adequate assurance of future performance under any

DB04/839144.0002/3018472.9 DD02

executory contract or unexpired lease to be assumed and assigned to the Competing Bidder under the Competing Bidder's proposed APA;

vi. The Qualified Bid must be accompanied by a board resolution or other similar document demonstrating the authority of the Competing Bidder to make a binding and irrevocable bid; and

vii. All Qualified Bidders (with the exception of the Proposed Buyer to the extent of the Break-Up Fee) shall bear their own costs and expenses in connection with submission of bids, the Auction, the sale process and preparation of those documents necessary to effectuate a transfer of title of the Assets.

g. **Auction Procedures**. Only Qualified Bidders will be permitted to bid at the Auction. If no Qualified Bids are received, the Proposed Buyer will be deemed the winning bidder at the Auction. If Qualified Bids are submitted, the highest Qualified Bid, and in the event of multiple Qualified Bids of an equal value, the first such Qualified Bid received by Debtor, will be the "**Initial Auction Bid**." Each Qualified Bidder must appear in person or through a duly authorized representative at the Auction. After the announcement of the Initial Auction Bid, Debtor will allow for additional bidding at the Auction. The Proposed Buyer and any other Qualified Bidder may increase their respective bids as many times as they choose, provided that each subsequent bid must exceed the prior bid by at least $100,000.00, and the Proposed Buyer will receive cash credit for the Break-up Fee (as defined in Section 11.2(g) of the APA) and the Good Faith Deposit (as defined in Section 2.5 of the APA) in connection with any subsequent bid. Notwithstanding the foregoing, the Proposed Buyer, in lieu of exceeding the prior bid, may also match any competing bid, including the Initial Auction Bid, and Debtor will deem the Proposed Buyer's matching bid the highest and best offer based on the Break-up Fee that otherwise would be paid to the Proposed Buyer. The Auction shall continue until the Winning Bidder has been determined by Debtor.

h. **Sale Hearing**. On the day prior to the Sale Hearing (unless the Court conducts the Auction at the Sale Hearing), the Debtor will file a summary of the Auction, including the bid it wishes to approve as the highest and best offer for the Assets to be sold under the APA,

11

Case 2:10-bk-24062-GBN    Doc 4    Filed 07/30/10    Entered 07/30/10 17:25:42    Desc
DB04/839144.0002/3018472.9 DD02          Main Document    Page 11 of 22

which will be the highest bid received at the Auction, and that of the Proposed Buyer in the event that the Proposed Buyer elects to match a competing bid (such highest and best bid the "**Purchase Price**", and such bidder the "**Winning Bidder**"). At the Sale Hearing, the Court, pursuant to Bankruptcy Code § 363 shall consider the adequacy of the Proposed Sale (and in the case of the Proposed Buyer, the terms of the APA), and will also consider any objections to the entry of an order approving the sale to the Winning Bidder.

i. **Notice of Cure Costs**. By a date certain to be set by the Court, Seller shall file with the Bankruptcy Court a notice with respect to Cure Costs pursuant to Bankruptcy Code § 365(b)(1)(A) and serve such notice on all necessary persons. The notice shall set forth, (i) with specificity, the amount of the Cure Cost for each particular Assigned Contract and Assigned Personal Property Lease, if any, (ii) the intent to assume and assign to the Proposed Buyer such Assigned Contract or Assigned Personal Property Lease at the Closing Date, and (iii) the deadline for responses or objections to the assumption or assignment of such Assigned Contract or Assigned Personal Property Lease or to the Cure Cost related to same; and

j. **Break-Up Fee**. The Bid Procedures Order will approve the Break-Up Fee. Payment of the Break-Up Fee will: (a) be full consideration for the Proposed Buyer's efforts and expenses in connection with the bid process, including the due diligence efforts of the Proposed Buyer, and any out-of-pocket costs and expenses; and (b) constitute liquidated and agreed damages in respect of the transactions contemplated by the APA. The Break-Up Fee shall be paid by wire to the Proposed Buyer within one business day after the closing of the sale transaction with the Winning Bidder.

**Debtor's Anticipated Timeline for the Bankruptcy**

20. Debtor is filing this Motion contemporaneously with the filing of its Chapter 11 petition, and plans on consummating the Proposed Sale as quickly as possible. The APA requires that the Court schedule a hearing to approve the Bid Procedures and enter an order approving the Bid Procedures within 30 days of the filing of this Motion, and schedule a hearing on the Proposed Sale (the "Sale Hearing") and enter an order approving the sale within 30 days of approval of the Bid Procedures. Pursuant to the APA, Debtor will further schedule an auction for the first business day

12

DB04/839144.0002/3018472.9 DD02

that is at least two days prior to the date set for the Sale Hearing (the "Auction"), unless the Court conducts the Auction at the Sale Hearing.

21. Debtor requests that the Court set an emergency hearing on approval of the Bid Procedures, including the Break-Up Fee, within fifteen (15) days of the filing of this Motion, to expedite the sale process while providing any potential bidders a sufficient opportunity to perform due diligence and appear and bid for the Assets. As set out above, Debtor has already spent substantial time and effort marketing itself, and the only serious expression of interest was from the Proposed Buyer. Debtor's continued operations will be funded post-petition through a stipulation for the use of cash collateral with Northern Trust, which contemplates timely consummation of the proposed sale. Without the use of cash collateral Debtor may be unable to continue operations, resulting in a liquidation rather than a sale of a going business. The APA calls for entry of an order approving the sale and closing of the approved sale by October 15, 2010. As a practical matter, it is questionable whether this schedule will be met if hearings on both the Bid Procedures and the sale are set in the ordinary course. Debtor has therefore requested that the Court set the hearing on approving the Bid Procedures, including the Break-Up Fee, on an emergency basis.

22. Debtor has already undertaken substantial efforts to market its Assets, and plans on continuing to do so up until the Auction. To maximize the time that interested parties will have to conduct due diligence and prepare Auction bids, Debtor will hold the Auction approximately two days prior to the Sale Hearing, or, if the Court orders otherwise, at the Sale Hearing. If no competing Qualified Bids are received, Debtor will proceed with the sale of the Assets to the Proposed Buyer, and will present the sale pursuant to the terms of the APA to the Court for approval at the Sale Hearing. If a competing Qualified Bid is received, and such Qualified Bid presents the highest and best offer for the Assets, then Debtor will seek to approve the Qualified Bid and such Alternate Buyer at the Sale Hearing.

23. Debtor further intends on filing a Plan of Reorganization (the "Proposed Plan") prior to the Sale Hearing. The Proposed Plan will provide for the treatment of Debtor's creditors and interest holders, and will provide for the liquidation of any remaining assets that are not included in the Proposed Sale.

**RELIEF REQUESTED**

24.     Through this Motion, Debtor seeks the following relief:

a.     _Approval of Certain Auction and Bid Procedures and Break-up Fee_.  Pursuant to the APA, unless the Court prefers that the Auction occur at the Sale Hearing, a sale is proposed to be conducted by auction followed within two days by an approval hearing before the Court.  The Proposed Buyer will serve as a stalking horse purchaser at the Auction.  The Bid Procedures include, inter alia, approval of a Break-up Fee if Proposed Buyer is unsuccessful, and entry of a Bid Procedures Order acceptable to Proposed Buyer.  Debtor requests that the Court enter an order approving the Bid Procedures described above, and ordering that the Auction and the Sale Hearing be held in accordance with such Bid Procedures.

b.     _Setting a Time and Date for a Hearing on Approval of the Bid Procedures and Proposed Sale_.  Debtor requests that the Court set a time and date for a hearing on the sale of the Assets to the successful bidder at the Auction.  Unless the Court orders that the Court will conduct the Auction at the Sale Hearing, Debtor will schedule the Auction for the first business day that is at least two days prior to the Sale Hearing.

c.     _Approving the Form for Notice of the Auction and Sale Hearing_.  Debtor requests that the Court approve the form and procedure for Debtor to provide notice of the Auction and Sale Hearing in a form substantially similar to that contained in **Exhibit D.**

d.     _Approving Asset Purchase Agreement, Including Assumption and Assignment of Executory Contracts and Unexpired Leases_.  Debtor seeks entry of a final order at the Sales Hearing approving the APA and the sale of the Assets thereunder, including assumption and assignment of the executory contracts and unexpired leases identified by the Proposed Buyer, free and clear of liens, claims and encumbrances.

**BASIS FOR RELIEF**

**The Sale of the Assets**

25.     Bankruptcy Code § 363(b)(1), provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…"  11 U.S.C. § 363(b)(1).  Although Bankruptcy Code § 363 does not set forth a standard for determining when it is

appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property under Bankruptcy Code § 363(b) is appropriate if the transaction is supported by the sound business judgment of the debtor. *See Committee of Equity Security holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del. 1991); *Stephens Indus. V. McClung,* 789 F.2d 386, 398-90 (6th Cir. 1986).

26.     Courts have traditionally applied four factors in determining whether a sound business justification exists to authorize a debtor to sell assets outside of the ordinary course:  (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is being provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. *See In re Delaware & Hudson Ry. Co.,* 123 B.R. at 175 (adopting the *Lionel* factors in determining whether sound business purpose exists for sale outside ordinary course of business).

27.     As discussed in the Rosenberger Declaration, business exigencies justify a prompt sale of Debtor's Assets on an ongoing basis.  Debtor has been operating at a loss and has limited funding to maintain operations.  To support an expedited sale, Debtor's primary secured lender, Northern Trust, has agreed to allow Debtor to use its cash collateral in accordance with an agreement for which separate approval is being sought.  Debtor undertook its best efforts to market the sale of the Assets, and negotiated the Proposed Sale in good faith and at arms-length.  Debtor believes that the Assets have been sufficiently exposed to the market, and that the Bidding Procedures will ensure that the Proposed Sale, in conjunction with the Bidding Procedures, will result in the highest or otherwise best offer for the Assets, and represent the best scenario for Debtor's estate and creditors.

**Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

28.     Debtor is requesting authorization to sell the Assets free and clear of liens, claims, encumbrances and interests.  Bankruptcy Code § 363(f) authorizes the debtor-in-possession to sell property under section 363(b) "free and clear of any interest in such property an entity other than the estate" if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § § 363(f)(1) – (f)(5).

29.     Northern Trust is secured by all of Debtor's Assets.  Northern Trust has consented to the Proposed Sale process, but reserves its right to review and approve the Sale Order.  The rest of the Secured Claimants are either lessors under real or personal property leases, Counterparties to Executory Agreements, or creditors under secured transactions.  Debtor submits that with regard to these Secured Claimants, either such creditors have consented to the Proposed Sale, the Debtor is proposing to assume the Executory Agreements, or the creditors will be paid their secured claims in full from the Proposed Sale.  Consequently, the proposed sale free and clear of all liens, claims, encumbrances and interests satisfies § 363(f) of the Bankruptcy Code.

**Determination of Good Faith Purchaser**

30.     Section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of an order approving a sale under sections 363(b) or (c) does not affect the validity of a sale to an entity that purchased property in good faith, whether or not it knew of the appeal, unless the sale was stayed pending appeal.  If the Proposed Bidder is the Winning Bidder, Debtor will ask the Court at the Sale Hearing to determine that the Proposed Bidder is a good faith purchaser entitled to the protection of section 363(m).

**Waiver of Stays Under Federal Rules.**

31.     The APA requires that the order approving the sale waive the 14-day stay provided by Bankruptcy Rules 6004(h) and 6006(d), and determine that there will be no stay of execution of the

Sale Order under Federal Rule of Civil Procedure 62(a). This is an appropriate case for waiving any such stays and Debtors will so request at the Sale Hearing.

**Assumption and Assignment of the Executory Agreements**

32. Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession may assume any executory contract or unexpired lease, subject to approval of the Bankruptcy Court. Section 365(f) provides that a debtor-in-possession may assign an executory contract or unexpired lease if the debtor-in-possession assumes such contract or lease in accordance with Section 365(a) and adequate assurance of future performance by the assignee of such contract or lease is provided.

33. Moreover, the business judgment test applies to the Court's determination of whether to approve a debtor's assumption and assignment of an executory contract. Approval under Section 365 is appropriate if the debtor's business judgment is that assumption and assignment would be beneficial to the estate. *See In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd* 465 U.S. 513 (1984); *In re Transworld Airlines, Inc.,* 261 B.R. 103, 120-21 (Bankr.D.Del. 2001).

34. Debtor is only seeking in this motion to assume Executory Agreements that will be included in the Proposed Sale. Debtor believes that the assumption of such Executory Agreements is in the best interest of the estate because it will facilitate the Proposed Sale, and ensure the highest sale price by increasing the value of the Assets being transferred.

35. Debtor believes that all Counterparties to the assumed and assigned Executory Agreements will be satisfied that the Proposed Buyer, or a qualified Alternate Buyer, will be capable of curing arrearages and performing under the Executory Agreements.

**The Court Should Authorize Debtor to Conduct the Auction in Accordance with the Bid Procedures**

36. Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. By this Motion, Debtor seeks authority to proceed with the Auction in accordance with the Bid Procedures. As set forth above, Debtor has determined that the sale of its Assets through the Auction will enable it to obtain the highest and best offers for the Assets, and thus maximize the value of the estate for the benefit of its creditors.

Accordingly, Debtor believes it is in the best interest of Debtor, its estate, and its creditors to conduct the Auction and consummate the sale. Debtor proposes to conduct the Auction on the terms and conditions set forth in the Bid Procedures detailed above.

37.     The Auction and Bid Procedures represent the outcome of lengthy discussions and negotiations among Debtor, Northern Trust, and the Proposed Buyer, and Debtor believes the Bid Procedures fairly balance the interests of all parties and are reasonably calculated to promote a fair and equitable process for the sale of the Assets. The Bid Procedures are intended to provide any interested parties with a reasonable period of time to conduct due diligence and, if qualified, to submit bids, while still providing a prompt, orderly process addressing Debtor's urgent need to sell the Assets in an expeditious manner, and protecting the Proposed Buyer's financial and temporal investment. Debtor believes that the Bid Procedures, coupled with its prepetition efforts to identify potential purchasers of its Assets, should result in a successful auction and sale process. Accordingly, Debtor believes that good cause exists to approve the terms and conditions of the Bid Procedures, and that the Bid Procedures are a fair and reasonable means to achieve a sale of the Assets to the Proposed Buyer or another successful bidder. Debtor therefore requests that the Court enter its Order approving the Bid Procedures.

**The Break-Up Fee is Warranted**

38.     Under the terms of the APA and the Bid Procedures, if a Competing Bid is accepted by Debtor and approved by the Court, the Proposed Buyer will be entitled to a Break-Up Fee equal to 4% of the eventual sale price approved by the Court plus the Proposed Buyer's reasonable out-of-pocket legal and other fees and expenses not to exceed $250,000.

39.     In the context of bankruptcy cases, it is frequently appropriate to grant protections to the "stalking horse" bidder. Buyer protections, including break-up fees, are designed to compensate a prospective purchaser for the costs and risks involved in preparing and proposing a bid that will establishing a minimum standard for competing bids. *In re Integrated Resources, Inc.,* 147 B.R. 650, 58 (S.D.N.Y. 1992). Historically, bankruptcy courts have approved break-up fees under the "business judgment rule," which proscribes judicial second-guessing of the actions of management taken in good faith and in the exercise of honest judgment. *In re Integrated Resources, Inc.,* the leading case on

break-up fees, established three basic factors for determining whether to approve such fees: (i) whether the relationship between the initial bidder and the seller is tainted by self-dealing or manipulation; (ii) whether the fee is designed to encourage bidding; and (iii) whether the amount of the fee is reasonable in relation to the purchase price. *Id.* at 657-58.

40. Debtor submits that the Break-up Fee satisfies the three factors set forth in *In re Integrated Resources*. First, there is no relationship between Debtor and Proposed Buyer. The Proposed Buyer is a subsidiary of Vanguard Health Systems, Inc., which has no interest in or affiliation with the Debtor. Second, the Break-up Fee is an inseparable component of the APA. The APA encourages bidding by (i) providing a platform upon which Competing Bids may be made, and (ii) inspiring interest in the Assets by providing a recognizable and well-respected institution that is interested in purchasing the Assets. Finally, the Break-Up Fee is reasonable in light of the time and effort invested by the Proposed Buyer in connection with the APA and the Proposed Sale.

41. In the Ninth Circuit, courts have held that, in considering whether to approve a break-up fee, the court must determine whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike," *In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr.D.Ariz. 1994) *quoting In re Lionel Corp.,* 722 F.2d at 1071, and "be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id., citing In re Hupp Indus., inc.,* 140 B.R. 191, 196 (Bankr.N.D.Ohio 1992). Debtor submits that the Break-up Fee falls within these standards and should be approved.

42. Debtor's decision to sell the Assets is based upon its reasonable exercise of the Debtor's sound business judgment. Debtor has undertaken significant efforts to sell its Assets, and to the best of its knowledge, the Proposed Sale represents Debtor's highest, best and only offer for the Assets. Debtor believes the terms of the APA are fair and reasonable and represent the best, and perhaps only, chance of providing some recovery for Debtor's unsecured creditors.

43. The Break-Up Fee was a highly negotiated component of the APA. Moreover, the Break-Up Fee will only be payable if Debtor receives a higher or better offer than the proposed price, and pursuant to the Bid Procedures, any Competing Bid must exceed the proposed sale price by 4%.

Consequently, in the event a Break-Up Fee is paid, it will necessarily be on account of a sale price that exceeds the Proposed Sale price by at least 4%.

## Scheduling a Hearing on the Proposed Sale and Bid Procedures

44.     As discussed above, in light of Debtor's cash position, the terms of its cash collateral stipulation with Northern Trust, and consistent with the APA and the anticipated closing date of October 15, 2010, Debtor requests that the Court schedule an emergency hearing to approve the Bid Procedures, including approving the Break-Up Fee, within fifteen (15) days of the date of this Motion. Debtor further requests the Court schedule the Sale Hearing for a date that is no later than thirty (30) days after entry of the Bid Procedures Order.

45.     The Debtor will timely give notice of this Motion, the hearing on the Bid Procedures, and the Sale Hearing, as they are set.  Moreover, Debtor will schedule and give notice of the proposed Auction upon the Court's setting of the Sale Hearing, and (unless the Court orders that the Court will conduct the Auction at the Sale Hearing) such Auction will be held on the first business day that is at least two days prior to the Sale Hearing at the offices of Stinson Morrison Hecker, LLP, 1850 N. Central Ave., Suite 2100, Phoenix, Arizona, 85004-4584.

## Notice of Auction and Sale Hearing

46.     In accordance with Bankruptcy Rule 2002, Debtor proposes to give notice of the Auction and Sale Hearing substantially in the form attached hereto as **Exhibit D** (the "Auction and Sale Hearing Notice") by first class mail deposited as soon as practicable after the date of the Order setting the date and time of the Sale Hearing to (i) the Office of the United States Trustee, (ii) all counterparties to Executory Agreements, (iii) all creditors of the Debtor, (iv) all parties who have expressed interest to Debtor in acquiring the Assets, (v) all appropriate federal, state and local taxing authorities, and (vi) all parties having filed a notice of appearance in the this case.

47.     The Auction and Sale Hearing Notice will set forth, among other things, a general description of Debtor's business, including the Assets, the Executory Agreements, the Bid Procedures and the name and address of a contact person for Debtor.  Debtor submits that such notice constitutes good and sufficient notice of the Auction and the Sale Hearing and that no further notice need be given.  Accordingly, Debtor requests the Court approve the form and manner of notice set forth herein.

20

Case 2:10-bk-24062-GBN    Doc 4    Filed 07/30/10    Entered 07/30/10 17:25:42    Desc
DB04/839144.0002/3018472.9 DD02         Main Document         Page 20 of 22

## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court

(A) Set a hearing to approve the Bid Procedures, including the Break-Up Fee, on an emergency basis;

(B) Enter a Bid Procedures Order in the form of Exhibit B hereto, authorizing the sale of the Assets through the Auction and approving the Bid Procedures, including the Break-Up Fee;

(C) Set a hearing on approval of the sale of Debtor's Assets no later than thirty (30) days after entry of the Bid Procedures Order;

(D) Enter a Sale Order, at or after the Sale Hearing, in the form of Exhibit C, hereto, approving the APA and authorizing and approving the sale of substantially all of Debtor's assets free and clear of all liens, claims, interests and encumbrances pursuant to Section 363 of the Bankruptcy Code;

(E) Approve the assumption and assignment to the successful bidder, pursuant to Section 365 of the Bankruptcy Code, of the Executory Agreements included on Schedules 4.8 and 4.19 attached to the APA, as may be supplemented by Proposed Buyer in accordance with Section 1.3 of the APA;

(F) Waive the 14-day stay provided by Bankruptcy Rules 6004(h) and 6006(d), and determine that there will be no stay of execution of the Sale Order under Federal Rule of Civil Procedure 62(a); and

(G) Approve the form for providing notice of the Auction and Sale Hearing in the form attached hereto as Exhibit D.

DB04/839144.0002/3018472.9 DD02

1    RESPECTFULLY SUBMITTED this July 30, 2010.

2                                    **STINSON MORRISON HECKER** LLP

3

4                            By:    /s/ Christopher Graver (#013235)
                                    C. Taylor Ashworth
5                                   Christopher Graver
                                    Josh Kahn
6                                   1850 N. Central Avenue, Suite 2100
                                    Phoenix, Arizona  85004-4584
7                                   Proposed Attorneys for Arizona Heart Institute,
                                    Ltd.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28